# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| FRIEDA ZEIDEL and CARLA SERRANO, individually and on behalf of a class of similarly situated individuals | ) ) ) | |
| | ) | Case No. 13-cv-6989 |
| Plaintiffs, | ) ) | |
| | ) | Judge Robert M. Dow, Jr. |
| v. | ) ) | |
| A&M (2015) LLC, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiff Carla Serrano's motion for class certification [99], Defendant A&M (2015) LLC's second motion for summary judgment [93], Plaintiffs' motion to file a sur-reply in opposition to the motion for summary judgment [124], and Defendant's motion to file sur-sur-reply in further support of the motion for summary judgment [127]. For the reasons set forth below, Plaintiff's motion for class certification [99] is granted and Plaintiffs' motion to file a sur-reply [124] is granted. Defendant's motion to file a sur-sur-reply [127] is granted and the motion for summary judgment [93] is denied. This case is set for further status on April 19, 2017, at 9:30 a.m. to discuss pre-trial scheduling and the possibility of settlement.

## I.      Background

Defendant A&M (2015) LLC (formally known as YM LLC USA) operates the retail clothing store, MANDEE.[1] MANDEE stores are located predominately on the East Coast, but one store is located in Norridge, Illinois. In May 2013, Plaintiff Frieda Zeidel was shopping at

---

[1] The Court takes the relevant facts from the parties' Local Rule 56.1 statements [96; 111] and their responses to each other's Rule 56.1 statements [111; 120]. The Court construes the facts in the light most favorable to the nonmoving party—here, Plaintiffs.

the Norridge MANDEE store when she provided a sales associate with her cell phone number.

On June 5, 2013, Plaintiff Zeidel received the following text message on her phone:

> Welcome to VIP status! Your gift: 20% OFF ur purch. Exclusive offers 2 come. Cannot combine RC 427 Expires in 30 days. www.Mandee.com Rply STOP to stop.

Plaintiff Carla Serrano also visited the same MANDEE store, gave her cell phone number to an in-store sales associate, and received this same text message on December 31, 2013. Both Plaintiffs contend that they did not consent to receive this text message.

Between May 2013 and March 2014, Defendant contracted with Mozeo, LLC to send marketing text messages to MANDEE customers. Mozeo operates an Internet accessible platform that enables users, like Defendant, to create and send emails or text messages to their customers. The only people who received text messages from Defendant through Mozeo were those whose information was stored in Defendant's Customer Maintenance database. The information in the database is voluntarily collected from consumers, who can input their contact information on the MANDEE website or provide this information to sales associates when shopping at a MANDEE store. Customers can also send a text message to Mozeo with the name "MANDEE" or "A&M" to be added to this database. No phone numbers in Defendant's database were "provided, generated, or created by Mozeo in any fashion." [111, ¶ 15.]

The Mozeo platform allows users to create and update a contacts list, which can be input manually or imported from a data file like a spreadsheet. Messages are sent through a shared SMS shortcode, which is a code used by text-message aggregators to send or receive messages. Some messages sent through Mozeo require a multi-step process. The user must select the recipients of the message, input the message content, determine when the message should be sent, and finalize it before Mozeo (or its text message aggregator) interacts with the wireless carrier and sends the message to the customer's phone numbers using the SMS shortcode.

Other messages can be sent to customers "automatically." [120, ¶ 4.] The "welcome" text messages that Plaintiffs received fall into this category, and were "automatically sent * * * as a result of the customer providing their cellular telephone number to a Mandee's sale associate in-store at the point of sale." *Id.* Specifically, a phone number is entered into Defendant's electronic cash register with a "Mobile Opt-In" data entry field. *Id.* ¶ 8 The parties dispute whether this field defaults to "yes" or "unknown," the latter of which would require the sales associate to select "yes" or "no" from a drop-down menu. Once the contact information is entered into the register, it is "automatically uploaded into Defendant's Customer Maintenance database" and then "automatically uploaded into Mozeo's database." *Id.* ¶¶ 9, 10. "Mozeo immediately thereafter automatically sen[ds] a 'welcome' message to the telephone number." *Id.* ¶ 10. These messages were sent by the Mozeo platform every day from June 1, 2013 through February 28, 2014. *Id.* Between October 17, 2013 and February 28, 2014, at least 79,404 unique phone numbers were sent Defendant's "welcome" messages using shortcode 24587. [99, at 15.]

One more aspect of the Mozeo platform requires description. The platform has a "Text-to-Win" feature that "randomly chooses a telephone number from a list of numbers and immediately sends a text message notification to the randomly chosen number." [120, ¶ 16 (punctuation altered).] According to Plaintiffs, this feature operates by determining the total number of phone numbers in a stored list, runs a program that generates a random number between 1 and total number of stored phone numbers, and then dials the phone number corresponding to the randomly generated number.[2]

---

[2] Defendant disputes Plaintiffs' "characterization" of the Text-to-Win feature as "premised entirely on supposition" [120, at 6]. Local Rule 56.1 requires a party who disagrees with an opposing party's statement of fact to provide "specific references to the affidavits, parts of the record, and other supporting materials" to support the basis for this disagreement. Defendant's Rule 56.1 response fails to do so, but its brief attaches a declaration from a Mozeo officer disputing Plaintiff's description. [120-1.]

Plaintiffs contend that Defendant's conduct violates the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA"). They argue that Defendant maintained a "policy and practice of gathering telephone numbers, obtaining oral consent to send text messages, and actually sending the text messages" through the Mozeo platform. [99, at 12.] Plaintiff Serrano moves to certify a class action involving certain recipients of Defendant's text messages for alleged TCPA violations [99]. Defendant moves for summary judgment [93].

## II. Legal Standard

### A. Federal Rule of Civil Procedure 23

To be certified as a class action, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a) and one of the three alternative requirements in Rule 23(b). *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). Rule 23(a) provides that a named party may sue on behalf of individuals who are similarly situated if: (1) the class is so numerous that joinder of all putative class members is impracticable ("numerosity"); (2) there are questions of law or fact common to the putative class ("commonality"); (3) the claims or defenses of the named party are typical of the claims or defenses of the putative class members ("typicality"); and (4) the named party will fairly and adequately protect the interests of the class ("adequacy"). Fed. R. Civ. P. 23(a). "[A] proposed class must always meet the Rule 23(a) requirements." *Messner*, 669 F.3d at 811. "Because Rule 23(a) provides a gate-keeping function for all class actions, ordinarily we would begin there and only turn our attention to Rule 23(b) after we were certain that all of Rule 23(a)'s requirements had been met." *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 374 (7th Cir. 2015).

When certification is sought under Rule 23(b)(3), as it is here, the proponent of the class must also show that: (1) questions of law or fact common to the members of the proposed class predominate over questions affecting only individual class members ("predominance"); and (2) a

class action is superior to other available methods of resolving the controversy ("superiority"). *Messner*, 669 F.3d at 811. Moreover, the class must also meet Rule 23's "implicit requirement of 'ascertainability,'" meaning that the class is "defined clearly and based on objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015).

Plaintiff bears the burden of proving that she is entitled to class certification. *Messner*, 669 F.3d at 811. Although class certification proceedings are not "a dress rehearsal for the trial on the merits," *id.*, the Court does not presume that all well-pleaded allegations are true for purposes of deciding the certification question. See *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676–77 (7th Cir. 2001). Rather, before the Court allows a case to proceed as a class action, it "should make whatever factual and legal inquiries are necessary under Rule 23." *Id.* at 676. "A party seeking class certification must affirmatively demonstrate [her] compliance with the Rule—that is, [s]he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original). But the showing need not be "to a degree of absolute certainty. It is sufficient if each disputed requirement has been proven by a preponderance of evidence." *Messner*, 669 F.3d at 811. The Court exercises broad discretion in determining whether class certification is appropriate given the particular facts of the case. See *Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998).

## B.      Federal Rule of Civil Procedure 56

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To establish that a material fact is undisputed, the movant "must support the assertion by * * * citing to particular parts of materials in the record, including depositions, documents,

electronically stored information, affidavits or declarations, stipulations * * *, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). In determining whether summary judgment is appropriate, the Court should construe all facts and reasonable inferences in the light most favorable to the non-moving party. See *Carter v. City of Milwaukee*, 743 F.3d 540, 543 (7th Cir. 2014). Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party would bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Put another way, the moving party may meet its burden by pointing out to the court that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

To avoid summary judgment, the opposing party then must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). For this reason, the Seventh Circuit has called summary judgment the "put up or shut up" moment in a lawsuit—"when a party must show what evidence it has that would convince a trier of fact to accept its version of events." See *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted). The "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252.

## III. Analysis

The TCPA prohibits the making of "any call (other than a call * * * made with the prior express consent of the called party) using any automatic telephone dialing system * * * to any * * * cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA applies equally to text messages. See *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 667 (2016). The statute

6

defines an "automatic telephone dialing system" or ATDS as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id.* § 227(a)(1). While use of an ATDS is an element of a plaintiff's prima facie case, consent is an affirmative defense for which a defendant bears the burden of proof. *Thrasher-Lyon v. Ill. Farmers Ins. Co.*, 861 F. Supp. 2d 898, 905 (N.D. Ill. 2012) (collecting cases). Both concepts play some role in Plaintiff Serrano's motion for class certification—the issue to which the Court turns first.

### A. Class Certification

Plaintiff Serrano, but not Plaintiff Zeidel, seeks to certify a Rule 23(b)(3) class with the following definition:

> All persons in the United States and its Territories who were sent the text message:
>
> > Welcome to VIP status! Your gift: 20% OFF ur purch. Exclusive offers 2 come. Cannot combine RC 427 Expires in 30 days. www.Mandee.com Rply STOP to stop
> >
> > or
> >
> > Welcome to VIP status! Your gift: 20% OFF ur purch. Exclusive offers 2 come. Cannot combine RC 2028 Expires in 30 days. www.Mandee.com Rply STOP to stop
> >
> > or
> >
> > Welcome to VIP status! UR Gift – 20% OFF!! Xclusive offers 2 come! Rstr Apply. Valid 30 Days. RC 2028 http://on.fb.me/1tB17h Rply STOP to stop
>
> on their cellular telephones from the shortcode 24587 after October 16, 2013 without providing prior express written consent to receive such messages.

[99, at 9.] With this definition, Plaintiff's intends to exclude from the class those people who received these text messages after submitting their contact information on MANDEE's website, those who sent a text message with Defendant's shortcode requesting to receive these text

messages to Mozeo, and in-store customers who consented in writing to receive text messages. *Id.* at 14–15. She picked the October 16, 2013 start date because that is the effective date of a Federal Communications Commission ("FCC") regulation that defines "prior express consent" to mean *written* consent. See *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, 1831, 157 (Feb. 15 2012); 47 C.F.R. § 64.1200(f)(8) ("The term prior express written consent means an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system."); *Van Patten v. Vertical Fitness Grp., LLC*, 22 F. Supp. 3d 1069, 1073 (S.D. Cal. 2014). Before that, there was no clear mandate from the FCC that consent be written.[3]

Defendant responds to Plaintiff's class certification motion by indicating that it "is not fundamentally opposed to certification of a class." [105, at 3.] Indeed, with the exception of ascertainability, Defendant does not dispute that Plaintiff has met her burden on all of Rule 23's requirements. Defendant sent the "welcome" messages to at least 79,404 unique cell phone numbers, satisfying numerosity. [99, at 15]; *Pope v. Harvard Banschares, Inc.*, 240 F.R.D. 383, 387 (N.D. Ill. 2006) ("Generally, where the membership of the proposed class is at least 40, joinder is impracticable and the numerosity requirement is met."). Regarding commonality, Plaintiff contends that all putative class members were sent substantially the same message using the same third-party text messaging service. [99, at 22]; *CE Design v. Beaty Const., Inc.*, 2009 WL 192481, at *4–5 (N.D. Ill. Jan. 26, 2009) (holding that "uniform and routine" transmission of faxes was a common question under the TCPA). Common questions include whether the transmission of the "welcome" messages through Mozeo constitutes an ATDS and whether the

---

[3] Plaintiff Zeidel is not included within Plaintiff Serrano's proposed class since she received Defendant's text message in June 2013—before the FCC's written consent rule took effect. [99, at 9 n.2.]

text messages are an "advertisement" or "telemarketing" under the TCPA. Typicality is met because—just like the absent class members—Plaintiff Serrano gave her phone number to MANDEE in-store personnel and received the same text message after October 16, 2013 through the Mozeo platform using the same shortcode. Likewise, her TCPA claim is indistinguishable from the absent class members' TCPA claims: she alleges the same statutory violation and seeks the same statutory damages. *CE Design*, 2009 WL 192481, at *5. Because she has a sufficient non-antagonistic interest in pursuing this claim and her counsel is sufficiently experienced, qualified, and able to vigorously conduct this litigation [see 99-1, ¶¶ 19–22, 24], adequacy is satisfied as well. *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 598 (7th Cir. 1993).

The Rule 23(b)(3) requirements are also met. Common questions of law and fact related to Defendant's alleged uniform practice of sending substantially similar text messages to the class members, its "policy of collecting the Class member's cellular telephone numbers orally," alleged use of an ATDS, and alleged lack of written consent predominate over any individualized issues. [99, 28–29]; see, *e.g.*, *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 253 (N.D. Ill. 2014). Moreover, a class action is superior to tens of thousands of potential plaintiffs pursuing identical claims across the country under the same federal statute for a potential statutory recovery of $500 or "actual monetary loss," whichever is greater. 47 U.S.C. § 227(b)(3)(B); see *Chapman v. Wagener Equities, Inc.*, 2014 WL 540250, at *16 (N.D. Ill. Feb. 11, 2014). "Resolution of the issues on a classwide basis, rather than thousands (or zero) individual lawsuits is an efficient use of judicial resources." *Green v. Serv. Master On Location Servs. Corp.*, 2009 WL 1810769, at *3 (N.D. Ill. June 22, 2009) (collecting TCPA cases).

That leaves only ascertainably. To show ascertainability, the class must be "defined clearly and based on objective criteria." *Mullins*, 795 F.3d at 659. "There can be no class action

if the proposed class is amorphous or imprecise." *Id.* (citation omitted). A vague definition is problematic "because a court needs to be able to identify who will receive notice, who will share in any recovery, and who will be bound by a judgment." *Id.* at 660. "To avoid vagueness, class definitions generally need to identify a particular group, harmed during a particular time frame, in a particular location, in a particular way." *Id.* Here, the putative class members can be identified by whether they received any of the three text messages during the relevant date range and can be excluded from the class if they provided their phone number through Defendant's website, by texting the shortcode to Defendant, or by filling out a written consent form.

Nevertheless, Defendant proposes a few "modifications" to the class definition. Defendant's proposed class definition reads: "All persons in the United States and its Territories who, after October 16, 2013, were sent on their cellular telephone from the shortcode 24587, by means of an Automatic Telephone Dialing System ('ATDS'), the text message" and then lists the three text messages. [105, at 3.] This modification combines the first and last paragraphs of Plaintiff's class definition, adds the phrase "by means of an Automatic Telephone Dialing System ('ATDS')," and deletes the phrase "without providing prior express written consent." Plaintiff does not contest the first modification, but challenges the latter two.

First, Defendant argues that referencing an ATDS in the class definition is necessary because the use of an ATDS is an element of Plaintiff's prima facie case and "it would be overreaching to define the putative class to include persons who may have received from [Defendant] texts sent using other means not proven to constitute an ATDS." [105, at 3–4.] Plaintiff argues that introducing an ATDS into the class definition would "first require a legal determination by the Court on the merits of the class members' claims regarding whether the

messages were sent using an ATDS," and thus it would be "improper" to inject this threshold legal question into the determination of who is and is not part of the class. [121, at 5.]

Neither side is completely right. Courts accept class definitions that reference an ATDS, and it is not obvious that doing so *requires* a finding of liability before class members can be identified. See, *e.g.*, *Mitchem v. Ill. Collection Serv., Inc.*, 271 F.R.D. 617, 618–19 (N.D. Ill. 2011) (rejecting an ascertainability objection to a class definition that begins "All persons called by [Defendant] using an automatic telephone dialing system * * *"). That said, Defendant does not justify why referencing an ATDS in the class definition is warranted in this case. All of Defendant's "welcome" text messages were sent "exclusively" through the Mozeo platform. [95, at 2; see also 96, ¶ 6 ("For the period from approximately May 28, 2013, until approximately March 25, 2014, * * * [Defendant] only used Mozeo to send text messages to [Defendant's] MANDEE customers.").] Either that platform is an ATDS or it is not. If the platform is not an ATDS, then adding this requirement would mean the proposed class has no members because without an ATDS, "there can be no TCPA violation." *Blow v. Bijora, Inc.*, 191 F. Supp. 3d 780, 785 (N.D. Ill. 2016). If the platform is an ATDS, then adding "by means of an [ATDS]" to the class definition does not eliminate a single text message recipient from the class. Said differently, the use of ATDS goes to the merits of the class's claim, not whether the proposed class is "defined clearly and based on objective criteria." *Mullins*, 795 F.3d at 659. Thus, Defendant's proposal to add language relating to ATDS is not necessary to make the class ascertainable.

Second, Defendant argues that inclusion of the phrase "without providing prior express written consent" would result in the certification of a "fail-safe" class. [105, at 4.] A "fail-safe" class is one that is "defined in terms of success on the merits." *Mullins*, 795 F.3d at 660. "[A]

class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Messner*, 669 F.3d at 825. According to Defendant, defining the class to include only people "who would prevail in the absence of [Defendant] coming forward with evidence of consent" will allow those against whom Defendant "could demonstrate the requisite, exculpatory consent" to opt-out of the class and pursue a separate suit against Defendant, which makes this a fail-safe class. [105, at 4.]

Plaintiff responds that the express written consent language provides an "objective criteria" and is an easy metric for identifying proper class members. [121, at 5–6.] Plaintiff also notes that some courts have certified classes that include consent-related language in the class definition. *Id.* at 7 (citing *Green*, 2009 WL 1810769, at *4, and *G.M. Sign, Inc. v. Grp. C Commc'ns, Inc.*, 2010 WL 744262, at *6 (N.D. Ill. Feb. 25, 2010)). However, Plaintiff offers that the class definition could be "rephrased" to avoid any concerns raised by Defendant's objction so that the last clause reads "on their cellular telephones from the shortcode 24587 after October 16, 2013, *other than* any individual who provided his/her name and phone number to Defendant through Defendant's website, or by sending a text message to Defendant, or the 489 individuals who provided such information on the written in-store forms attached as Exhibit O to Plaintiff's Motion for Class Certification." [121, at 7.] Plaintiff also believes that "any reasonable variation" of this language would suffice.

The Court agrees that the class definition should be modified along the lines of Plaintiff's proposal. Plaintiff seemingly uses the "without providing prior express written consent" language as a proxy for excluding certain text message recipients from the class based on how their phone number ended up in Defendant's customer database, not as a means to screen out class members against whom Defendant will have a valid affirmative defense. [105, at 4.] The

latter purpose would raise ascertainability concerns. See *Espejo v. Santander Consumer USA, Inc.*, 2016 WL 6037625, at *8 (N.D. Ill. Oct. 14, 2016) (holding that plaintiff proposed an impermissible fail-safe TCPA class where class membership required "a determination of consent—*i.e.*, whether the called party's number was 'volunteered' or 'verified' before [Defendant] used it"); *Mauer v. Am. Intercontinental Univ., Inc.*, 2016 WL 4698665, at *3 (N.D. Ill. Sept. 8, 2016) (holding that defining a class to include people who "did not previously provide express written consent to be contacted" was a fail-safe class (collecting cases)). Fail-safe problems "can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis." *Messner*, 669 F.3d at 825. The proper way to exclude people from the class is to address that exclusion directly in the class definition, rather than indirectly and with criteria that speak to which party will prevail on this liability issue.

For these reasons, the Court grants Plaintiff Serrano's motion for class certification [99], but modifies the class definition as follows:

> All persons in the United States and its Territories who were sent any of the following text messages on their cellular telephones from the shortcode 24587 after October 16, 2013:
>
>> Welcome to VIP status! Your gift: 20% OFF ur purch. Exclusive offers 2 come. Cannot combine RC 427 Expires in 30 days. www.Mandee.com Rply STOP to stop
>>
>> or
>>
>> Welcome to VIP status! Your gift: 20% OFF ur purch. Exclusive offers 2 come. Cannot combine RC 2028 Expires in 30 days. www.Mandee.com Rply STOP to stop
>>
>> or
>>
>> Welcome to VIP status! UR Gift – 20% OFF!! Xclusive offers 2 come! Rstr Apply. Valid 30 Days. RC 2028 http://on.fb.me/1tB17h Rply STOP to stop

> *except* for those persons who (1) provided his or her name and phone number to Defendant through Defendant's website; (2) sent a text message to Defendant using the shortcode 24587; and (3) provided his or her name, phone number, and signature to Defendant on a written form discussing text messages at a MANDEE store.

The Court appoints named plaintiff Carla Serrano as the class representative, and appoints Evan M. Meyers and Eugene Y. Turin of McGuire Law, P.C. as class counsel.

## B.    Summary Judgment

Defendant moves for summary judgment on the grounds that the Mozeo platform is not an ATDS. Again, the TCPA defines an ATDS as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). Congress charged the FCC with promulgating regulations that implement the TCPA's requirements, *id.* § 227(b)(2), and the FCC has adopted the TCPA's definition of an ATDS. See 47 C.F.R. §64.1200(f)(2) ("The terms automatic telephone dialing system and autodialer mean equipment which has the capacity to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers.").

### 1.    FCC Rulings

Although "[t]here is currently a dearth of appellate discussion regarding the circumstances in which a system is considered an ATDS for purposes of TCPA," the FCC has issued several regulations that elaborate on the meaning of an ATDS. *Blow*, 191 F. Supp. 3d at 785; see also *Dominguez v. Yahoo, Inc.*, 629 F. App'x 369, 372 (3d Cir. 2015); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 950–51 (9th Cir. 2009). In 1992, the FCC ruled that the TCPA's prohibitions "clearly do not apply to functions like 'speed dialing,' 'call forwarding,' or public telephone delayed message services (PTDMS), because the numbers called are not generated in a random or sequential fashion." *In re Rules & Regulations Implementing the Tel.*

14

*Consumer Prot. Act of 1991*, 7 F.C.C. Rcd. 8752, 8776 (1992) ("1992 Order"). Text messages had not yet been invented, but the FCC did analogize and apply these three examples of functions to "voice messaging services"—that is, "services which store and forward messages for later delivery to the called"—and concluded that they were not an ATDS. *Id.* at 8776–77; *Blow*, 191 F. Supp. 3d at 786 n.3 (noting that the first text message was sent on December 3, 1992, two months after the FCC issued the 1992 Order).

In 2003, the FCC returned to the definition of an ATDS. *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014 (2003) ("2003 Order"). The FCC's 2003 Order focused "on the practice of using autodialers to dial large blocks of telephone numbers in order to identify lines that belong to telephone facsimile machines" ("war dialing") and the use of "equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls" ("predictive dialers"). *Id.* at 14091, 14094. The FCC further described predictive dialers as "hardware, when paired with certain software, [that] has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers." *Id.* at 14091. "The principal feature of predictive dialing software is a timing function, not number storage or generation." *Id.* The FCC concluded that both war dialing and predictive dialers fall within the definition of an ATDS. *Id.* at 14090–95.

In reaching this conclusion, the FCC considered and rejected the argument that predictive dialers could not qualify as an ATDS because they "store pre-programmed numbers or receive numbers from a computer database and then dial those numbers in a manner that maximizes efficiencies for call centers," and yet did not "dial numbers 'randomly or sequentially.'" *Id.* at 14090. The FCC explained that "[t]he statutory definition" of ATDS "contemplates autodialing

equipment that *either* stores *or* produces numbers." *Id.* at 14091–92 (emphasis added).

Moreover, to be deemed an ATDS, "the equipment need only have the '*capacity* to store or

produce telephone numbers.'" *Id.* at 14092 (emphasis in original). "In the past, telemarketers

may have used dialing equipment to create and dial 10-digit telephone numbers arbitrarily," but

"the evolution of the teleservices industry has progressed to the point where using lists of

numbers" like a database "is far more cost effective." *Id.* To the FCC, "[t]he basic function of

such equipment, however, has not changed—the *capacity* to dial numbers without human

intervention." *Id.*

In 2012, the FCC reaffirmed its 2003 interpretation of ATDS. See *In re Rules &

Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 15391, 15399

n.5 (2012) ("2012 Order"). The FCC explained that the definition of ATDS "covers any

equipment that has the specified *capacity* to generate numbers and dial them without human

intervention regardless of whether the numbers called are randomly or sequentially generated or

come from calling lists." *Id.* Like the FCC's 2003 ruling, this definition emphasizes (1) dialing

without human intervention, and (2) the phone numbers can be randomly or sequentially

generated or derived from a set list, like a database.

In 2015, the FCC issued another ruling on the meaning of an ATDS. See *In re Rules &

Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961 (2015)

("2015 Order"). That order concerned the meaning of the term "capacity" and concluded that it

covers equipment that "lacks the 'present ability' to dial randomly or sequentially" at the time a

call is made so long as the equipment has "the 'capacity' to dial random and sequential

numbers." *Id.* at 7974. The FCC explained that its 2003 order had "implicitly rejected any

'present use' or 'current capacity' test" when it decided that a predictive dialer qualified as an

ATDS even though "the equipment presently lacked the necessary software." *Id.* Thus, "the capacity of an autodialer is not limited to its current configuration but also includes its potential functionalities." *Id.* While the FCC rejected the argument that a "mere 'theoretical' modification" would be sufficient, the FCC declined to address the "exact contours" of its interpretation of "capacity." *Id.* at 7974-75. The FCC reiterated that "speed dialing" was not an ATDS and "the basic functions of an autodialer are to 'dial numbers without human intervention' and to 'dial thousands of numbers in a short period of time.'" *Id.* at 7975. "How the human intervention element applies to a particular piece of equipment is specific to each individual piece of equipment, based on how the equipment functions and depends on human intervention, and is therefore a case-by-case determination." *Id.*

## 2. The Parties' Summary Judgment Arguments

With this interpretative landscape in mind, the Court turns to the parties' summary judgment arguments.[4] Defendant's opening brief argues that, consistent with these FCC rulings, the Mozeo platform requires "human involvement at nearly every step, making it more akin to a sophisticated speed dialer than to an ATDS." [95, at 11.] Defendant contends that "to send a text message using the Mozeo messaging system," Defendant must "select[] one or more message recipients from that client's contact list; input[] the message content the client wants to send to the selected contacts; determin[e] when to send the message; and finaliz[e] and confirm[] the details of the message to be sent, including the content." *Id.* at 11. Defendant's brief relies

---

[4] The Court notes that the FCC's 138-page 2015 Order has been appealed to the D. C. Circuit pursuant to the Administrative Procedures Act, 47 U.S.C. § 402 ("the Hobbs Act"). See *ACA, Int'l v. FCC*, No. 15-1211 (D.C. Cir. argued Oct. 19, 2016). Both parties discuss the 2015 Order and the FCC's briefing in *ACA International*, but neither side moves to stay this case pending resolution of *ACA International*. Cf. *Ankcorn v. Kohl's Corp.*, 2017 WL 395707, at *3 (N.D. Ill. Jan. 30, 2017) (collecting cases in which courts have ruled on motions to stay in TCPA cases while *ACA International* remains pending). The Court follows the parties' lead that the issues in *ACA International* do not affect the outcome of the present summary judgment motion and thus no stay is necessary here.

heavily on *Blow*, which applied these FCC rulings and granted summary judgment for the defendant because that text messaging platform required too much human intervention to qualify as an ATDS. See *Blow*, 191 F. Supp. 3d at 788–90. Defendant also argues that the Mozeo platform could not be modified to be an ATDS except through the "purposeful and intentional creation of code directed to the generation of random or sequential telephone numbers," which would "fundamentally alter the nature of Mozeo's platform." [95, at 13.]

Plaintiffs respond that Defendant's description of the Mozeo platform is irrelevant since it describes how the *wrong* text messages are sent. The "welcome" messages are the "only" text messages "at issue in this litigation," and those messages are sent automatically to customers once their information is loaded into the Defendant's Customer Maintenance database. [110, at 12–13.] Defendant effectively concedes the point in its response to Defendant's statement of facts [see 120, at ¶¶ 2–4, 9–10, 12], and its reply makes no serious effort to save this argument. Thus, it is undisputed that once Defendant's customers provide their contact information to an in-store sales associate and this information is entered into the electronic cash register, their contact information is "automatically uploaded" into the customer database, "automatically uploaded" into the Mozeo database, and then "Mozeo immediately thereafter automatically sen[ds] a 'welcome' message to the telephone number." *Id.* ¶¶ 9–10.

Based on these undisputed facts, Plaintiffs argue that the "welcome" messages were sent through an ATDS for three main reasons: (1) the "welcome" messages were sent without any human intervention beyond "the actual inputting of the numbers into Defendant's electronic cash register at the point of sale" [110, at 17]; (2) these messages were sent through an ATDS because "the 'random' or 'sequential' element that makes dialing equipment an ATDS is not related to its ability to 'generate' numbers, but rather its ability to *dial* numbers randomly or sequentially" (*id.*

at 23); and (3) even if the platform lacks the "present capacity" to be an ATDS, the platform could be easily modified through use of the software's "Text-to-Win" feature to have the "potential capacity" to be an ATDS under the FCC's rulings (*id.* at 25–26).

Sensing that the ground had shifted, Defendant's reply brief all but abandons reliance on the FCC's interpretations and instead emphasizes the TCPA's statutory text. Specifically, Defendant contends that Plaintiffs' first two arguments follow the "erroneous pronouncements of the FCC and simply ignor[e] the plain language of the" TCPA. [119, at 2.] Defendant argues that Plaintiffs' first argument about human intervention would "disregard" the text "altogether" if "the act of calling telephone numbers without human intervention is enough to make the Mozeo software platform an ATDS." *Id.* at 5. Regarding the second argument, Defendant argues that the plain meaning of Section 227(a)(1) is that the phrase "using a random or sequential number generator" modifies the phrase "to store or produce telephone numbers to be called." *Id.* This phrase does not modify "the act of dialing" such that all that is needed for an ATDS is "the capacity to *dial* numbers randomly or sequentially." *Id.* Defendant declares that the various FCC orders on the meaning of the ATDS constitute "at worst, a meandering and inconclusive set of assertions" and that, pursuant to *Chevron-U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), this "Court is not bound to accept an interpretation of 'ATDS'" offered by the FCC "which clearly ignores the plain meaning of the statute." *Id.* at 10–11.[5] Regarding Plaintiffs' third argument, Defendant challenges whether Plaintiffs' expert has a sufficient basis

---

[5] In response to this argument, Plaintiffs filed a motion for leave to file a surreply [124], which the Court grants. That submission points out Defendant's apparent change of heart regarding the force of the FCC's rulings and argues that district courts cannot apply *Chevron* to determine the validity of the FCC's orders. [124-1, at 2–3.] In response to that motion, Defendant filed a motion for leave to file a "sur-sur-reply" [127], which the Court grants. In that filing, Defendant disputes that it ever argued that this Court "must" follow the FCC's rulings and, in any event, it only argued on reply that this Court should reject Plaintiffs' construction of the FCC's rulings that are in conflict with the TCPA's plain meaning. [127-1, at 2–4.] Both parties wisely declined to pursue filing a sur-sur-sur-reply.

to opine on whether the Mozeo platform can be modified and offers its own declaration from Mozeo's owner disputing Plaintiffs' expert's opinions.  [See 120-1.]

### 3.  The Hobbs Act and Application of the FCC's Rulings

The Court first addresses whether it may disregard the FCC's interpretations and constructions of the term ATDS under *Chevron* if it accepts Defendant's "plain meaning" argument.  The clear answer to that question is no.  Under the Hobbs Act, courts of appeals have "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of * * * all final orders of the Federal Communications Commission."  28 U.S.C.A. § 2342 (1); see also 47 U.S.C. § 402(a).  "[T]he Hobbs Act prevents the district court from reviewing the validity of FCC regulations."  *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 449 (7th Cir. 2010).  Thus, "a district court may [not] proceed through step one of the *Chevron* analysis without rubbing up against the Hobbs Act's jurisdictional bar."  *Id.*; accord *Johnson v. Yahoo!, Inc.*, 2014 WL 7005102, at *3 (N.D. Ill. Dec. 11, 2014) ("[I]f tasked with applying only the statute's language, I would conclude that [defendant's] system does not constitute an ATDS because the [equipment] does not use a random or sequential number generator.  Nevertheless, the TCPA and Hobbs Act bind me to the FCC's interpretation."); *Blow*, 191 F. Supp. 3d 780, 787 ("[T]he FCC rulings are binding upon the Court, and the Court lacks the jurisdiction to determine whether the FCC acted with the scope of its statutory mandate.").  Whatever force Defendant's statutory argument may have, this Court must follow the FCC's interpretations of the TCPA.

Thus, the question before the Court is whether Defendant is entitled to summary judgment because its "welcome" messages sent through the Mozeo platform cannot constitute an ATDS as that term has been interpreted by the FCC.  The Court concludes that it is not.  The

FCC's 2003 Order effectively resolves this issue. That ruling found that equipment can qualify as an ATDS if it (1) "store[s] pre-programmed numbers or receive[s] numbers from a computer database"; (2) can "dial those numbers at random, in sequential order, or from a database of numbers"; and (3) its "basic function" is "the *capacity* to dial numbers without human intervention." 2003 Order, 18 F.C.C. Rcd. at 14090–92; see also *Lardner v. Diversified Consultants Inc.*, 17 F. Supp. 3d 1215, 1223 (S.D. Fla. 2014) (Equipment "qualifies as an ATDS under the statute because it automatically dials telephone numbers from a preprogrammed list.").

There is at least a triable issue of fact as to whether Defendant's "welcome" messages fit this definition. Defendant stores its all of its customers' phone numbers in a Customer Maintenance database. When a phone number is entered into the electronic cash register for the first time, it is automatically uploaded to the customer database, then automatically uploaded to the Mozeo database, and then the "welcome" message is "automatically" sent to the customer "immediately thereafter." [120, ¶¶ 9–10.] As Defendant concedes, the "extent of the human intervention" in these texts is (1) initially inputing the phone numbers into its list, and (2) originally writing the text of these three "welcome" message. [119, at 12.] There is no further human involvement in sending these text messages, thousands of which were sent every month.

Courts have found that equipment with similar attributes, sending similar text messages, can be an ATDS. See, *e.g.*, *Fields v. Mobile Messengers Am., Inc.*, 2013 WL 6774076, at *3 (N.D. Cal. Dec. 23, 2013) (denying summary judgment on the defendant's ATDS argument because "[l]ike predictive dialers, mBlox's equipment 'receive[s] numbers from a computer database,' namely [the contractor's] text-message platform, 'and then dial[s] those numbers [without human intervention].' * * * [T]here is no human interaction or intervention involved in sending text messages from mBlox's system[, which] * * * has the capacity to send millions of

texts per month and that the temporal manner in which the texts were sent indicates that 'human agency was not involved'"); *Johnson*, 2014 WL 7005102, at *2, 5 (denying summary judgment where defendant's system automatically "sends a 'Welcome' system message whenever" one of defendant's "users sends a personalized message to a number that has never before received a text message from [the system]" because there was evidence that the system "can pull numbers" from an address book "and dial them without a person ordering specific system message," which "is sufficient to defeat * * * summary judgment").

Courts have also rejected the argument that the amount of human intervention involved in merely entering a customer's telephone numbers into an electronic database removes the equipment from the definition of an ATDS.[6]  See, *e.g.*, *Moore v. Dish Network L.L.C.*, 57 F. Supp. 3d 639, 654 (N.D.W. Va. 2014) ("[I]t is irrelevant under the FCC's definition of a predictive dialer that humans are involved in the process of creating the lists that are entered into the Campaign Manager software"); *Sterk v. Path, Inc.*, 46 F. Supp. 3d 813, 819 (N.D. Ill. 2014) (finding that defendant's human intervention "merely relates to the collection of numbers" while its agent "then uses automated equipment to make calls from that list," and granting summary judgment for plaintiff because "calls from a stored list without human intervention is comparable to the predictive dialers").  Indeed, the court in *Blow* emphasized that "the level of human involvement" for sending text message through that equipment at issue in that case was "not restricted to the keying of numbers into the software," but extended to "nearly every step in the platform's text message transmission process."  191 F. Supp. 3d at 788.

"Every ATDS requires some initial act of human agency—be it turning on the machine or pressing 'Go.'  It does not follow, however, that every subsequent call the machine dials—or

---

[6] The amount of human intervention in drafting the welcome message is equivalent to the original recording of a prerecorded voice message.

message it sends—is a product of that human intervention." *Johnson*, 2014 WL 7005102, at *5. For that reason, "the human intervention test of the 2003 FCC Order does not inquire as to whether there is human intervention at the entering of a 'given set of numbers' or programming of the computer system, but rather if there is human intervention at the time a call is made/placed or when a number is actually dialed." *Morse v. Allied Interstate, LLC*, 65 F. Supp. 3d 407, 410 (M.D. Pa. 2014). Here, there is no human intervention at the time the "welcome" text is sent.

Defendant also maintains that what matters for an ATDS is the "capacity to generate telephone numbers sequentially or randomly," not "the act of calling using random or sequential numbers."[7] [119, at 6, 14.] But "courts have found equipment to qualify as an ATDS if it can dial numbers automatically, for example by calling or sending text messages to numbers in a preprogrammed list, irrespective of the presence of a random or sequential number generator." *Legg v. Voice Media Grp., Inc.*, 20 F. Supp. 3d 1370, 1375 (S.D. Fla. 2014) (collecting cases); *Sterk*, 46 F. Supp. 3d at 820 ("The uploading of call lists from [Defendant's] users is essentially the same as when a call list is entered by a telemarketer in a database. It is the ultimate calling from the list by the automated equipment that is the violation of the TCPA."). Likewise, "[t]he principal feature of predictive dialing software is a timing function, not number storage or

---

[7] Defendant spends much of its reply brief arguing that the FCC's "confusing" orders "can just as easily be viewed to support" its reading of the TCPA. [119, at 8.] For example, the 2003 order states that a predictive dialer "has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers." 18 F.C.C. Rcd. at 14091. Defendant argues that this language "does not negate the statutory requirement for the capacity to store or produce numbers using a random or sequential number generator." [119, at 9.] The commas in the order's quoted language, however, indicate that an ATDS is equipment that "has the capacity to store * * * numbers and dial those numbers * * * from a database of numbers." A similar construction (minus the commas) can be found in the 2012 Order. See 27 F.C.C. Rcd. at 15399 n.5 (noting that an ATDS is "any equipment that has the specified capacity to generate numbers and *dial them without human intervention* regardless of whether the numbers called are randomly or sequentially generated *or come from calling lists*." (emphasis altered)). These rulings—which this Court must follow—do not state that a random or sequential number generator must be used to store phone numbers. See *Dominguez*, 629 F. App'x at 373 n.1 ("[I]t is unclear how a number can be *stored* (as opposed to *produced* ) using a 'random or sequential number generator.'"). Likewise, they do not dispense with the "human intervention" test, as Defendant urges the Court to do here. See 2003 Order, 18 F.C.C. Rcd. at 14092; 2012 Order 27, F.C.C. Rcd. at 15399 n.5.

generation," and the FCC still found that equipment to be an ATDS. 2003 Order, 18 F.C.C. Rcd. at 14091; accord *Luna v. Shac, LLC*, 122 F. Supp. 3d 936, 939 (N.D. Cal. 2015) ("[T]he FCC has indicated that the definition of ATDS now includes 'predictive dialers,' which may dial numbers from preprogrammed lists rather than generate numbers randomly or sequentially."). The "sine qua non of a predictive dialer" is its "timing function" whereby "the dialer itself, and not the user, decides when to call." *Blow*, 191 F. Supp. 3d at 789. A reasonable jury could conclude the automatic timing function of the "welcome" messages is analogous to a predictive dialer.

Based on these undisputed facts and applicable law, there is sufficient evidence from which a jury could reasonably find that Defendant's "welcome" messages were sent using an ATDS based on its present capacity. Because this conclusion is sufficient to deny Defendant's summary judgment motion, the Court does not reach whether the Mozeo platform has the "potential functionalities" to be an ATDS based on modifications of the "Text-to-Win feature."[8]

## IV. Conclusion

For the foregoing reasons, the Court grants Plaintiff's motion for class certification [99], grants Plaintiffs' motion to file a sur-reply [124], grants Defendant's motion to file sur-sur-reply [127], and denies Defendant's motion for summary judgment [93]. The Court appoints named plaintiff Carla Serrano as the class representative, and appoints Evan M. Meyers and Eugene Y. Turin of McGuire Law, P.C. as class counsel. This case is set for status on April 19, 2017, at 9:30 a.m. to discuss pre-trial scheduling and the possibility of settlement.


Dated: March 30, 2017
_____
Robert M. Dow, Jr.
United States District Judge

---

[8] The 2015 Order dealt most directly with this doctrine, and its precise scope will likely be addressed by the D.C. Circuit in *ACA International*.